# In the United States District Court
# for the Southern District of Georgia
# Waycross Division

KAYLA DAVIS, as Next of Kin of Tina Davis,  *
Deceased; and KAYLA DAVIS, as            *
Administrator of the Estate of Tina Davis,   *
                                   *

      Plaintiff,                *

      vs.                    *        CV 511-105

JERRY POPE, et al.,         *

      Defendants.         *

## ORDER

Presently before the Court are Motions for Summary Judgment filed by Defendants Leon Gaff and Jerry Pope. <u>See</u> Dkt. Nos. 28, 29. For the reasons stated below, Defendants' Motions are **GRANTED**.

## BACKGROUND

This case arises from the death of Tina Davis ("Davis"), an inmate at the Coffee County Jail who escaped from custody while she was being held pre-trial on a drug-related offense. Dkt. No. 39, Ex. 1.

Every judge encounters cases in which one party's version of the facts seems unlikely or difficult to imagine. This case

presents the rare situation in which most of the facts-contested or otherwise-are astounding. The Court is left with the distinct impression that, if Davis were alive today, she would have a great deal to say regarding her escape. Unfortunately, Davis is unable to share her story, and much of the evidence in the record favorable to Plaintiff is incapable of being presented in an admissible form at trial. Those still alive reveal the following unusual story:

While incarcerated, Davis requested that she be taken to the probate court and a local bank to sign papers for a family matter. Dkt. No. 39, Ex. 1. Jail officials granted this request and Defendant Leon Gaff, a jail transport officer for the Coffee County Sheriff's Department, was charged with transporting Davis to complete her errands on October 9, 2009. Dkt. No. 39, Ex. 1.

According to Officer Gaff, upon leaving the bank on October 9, 2009, Davis asked Officer Gaff to take her to her home in Broxton, Georgia so she could feed her dogs. Dkt. No. 39, Ex. 1. Prior to her incarceration, Davis lived in the house with Danny Moore, her boyfriend. Officer Gaff testified that he granted Davis's request and transported her there. Dkt. No. 39, Ex. 1.

Officer Gaff's version of what occurred at the house is bizarre but uncontroverted. According to Officer Gaff, he

removed Davis's leg irons so that she could walk up the stairs into the house. Dkt. No. 39, Ex. 1. Inside the house, Davis fed the two dogs and then entered the bathroom to clean up. Dkt. No. 28, Ex. 3, ¶¶ 7-9. Davis asked if she could use Officer Gaff's cell phone so she could call her mother regarding the papers she had just signed, and Officer Gaff complied. Dkt. No. 28, Ex. 3, ¶ 9. At some point thereafter, Davis allegedly exited the restroom wearing a pair of men's boxer shorts and a t-shirt, carrying her prison uniform in her hands. Dkt. No. 28, Ex. 3, ¶ 11. Officer Gaff claims that Davis requested permission to take a bath, which Officer Gaff denied, at which point Davis returned Officer Gaff's cell phone. Dkt. No. 28, Ex. 3, ¶¶ 11-13. Davis then supposedly went to put up the dog food but suddenly ran out of the house barefoot clad only in men's underwear and a T-shirt, entered her Isuzu Rodeo parked outside, and drove off. Dkt. No. 28, Ex. 3, ¶ 14-15.

Both sides agree that, while at the house, Officer Gaff allowed Davis to use his cell phone and that Davis used the phone to make a call to Moore, her boyfriend. Dkt. 39, Ex. 1. Moore testified that during this conversation, Davis sounded "panicky" and "stressed out." Dkt. No. 48, 11:21-22. Moore testified that Davis told him she was at their house because:

> she had been taken to the bank to release the money
> for [Davis's] niece and that the officer that brought
> her there was going to tell everybody he brought her

> there so she could see her dogs but in reality the
> perverted old bastard just wanted some pu**y.

Dkt. No. 48, 12:1-10. Officer Gaff testified that he discovered Davis had lied and had not called her mother, because, after Davis's escape he redialed the number and reached Moore. Dkt. No. 28, Ex. B, 20-25.

Officer Gaff then pursued Davis in his police patrol car. Dkt. No. 39, Ex. 1. During the pursuit, Officer Gaff claims he called Coffee County 911 to report the escape, but no one responded. Dkt. No. 39, Ex. 1. Officer Gaff testified that he also called the Broxton County Police Department because Broxton was where she appeared to be headed. Dkt. No. 39, Ex. 1.

Although the Isuzu Rodeo was found later that same day parked on a road adjacent to a cotton field in Coffee County, neither Officer Gaff nor the other deputies at the Coffee County Sheriff's Department were able to locate Davis. Dkt. No. 39, Ex. 1. Officer Gaff claims that he was instructed by a superior to conclude his involvement in the search for Davis prior to the discovery of her vehicle in the cotton field. Dkt. No. 28, Ex. 3, ¶ 23. Twenty days later, Davis's dead body was found in the same cotton field near where her car was found. Dkt. No. 39, Ex. 1. The circumstances involving the discovery of Davis's corpse are not contained in the record.

AO 72A
(Rev. 8/82)

The Georgia Bureau of Investigation (GBI) Division of Forensic Sciences conducted an examination of Davis's body. See Dkt. No. 28, Ex. D. "Upon receipt of the body at autopsy, the shirt [was] pushed above the level of the breasts, and the shorts [were] somewhat askew, with the waistband pulled slightly downward on the hips." Dkt. No. 28, Ex. D. Decay had worked its effects on the body such that the eyes, tongue, and other body parts were missing or decayed. "In light of decomposition," the GBI report found no discernible trauma. Dkt. No. 28, Ex. D. The report concluded that Davis's cause of death and manner of death were "best classified as undetermined." Dkt. No. 28, Ex. D.

Defendant Sheriff Jerry Pope and the Coffee County Sheriff's Department filed a motion to dismiss in response to Plaintiff's Complaint. See Dkt. No. 9. This Court granted in part and denied in part that Motion to Dismiss. See Dkt. No. 20. All claims against the Coffee County Sheriff's Department and all claims against Sheriff Pope in his official capacity were dismissed. Dkt. No. 20. However, claims against Sheriff Pope in his individual capacity and against Officer Gaff remained.

Both remaining defendants have now moved for summary judgment. See Dkt. Nos. 28, 29. The Court conducted a hearing on the motions, and each is fully briefed. In opposition to

summary judgment, Plaintiff submitted two affidavits from former inmates-one from Karol Inman and another from Sabrina Laster-and an affidavit signed by Moore, the former boyfriend. See Dkt. No. 39, Exs. 3-5. After a motions hearing, Defendants' counsel deposed Inman and Moore and submitted the transcripts of those depositions to the Court. See Dkt. Nos. 48, 50. During the depositions, Inman and Moore expressly disavowed most of the statements contained in their affidavits. See Dkt. Nos. 48, 50.

The affidavit signed by Inman stated that she had personal knowledge that Officer Gaff would give women smoking privileges for showing their breasts, that the day prior to her disappearance Davis had shown Officer Gaff her breasts in order to smoke, and that detention officials knew that Officer Gaff did such things but did not reprimand him. See Dkt. No. 39, Ex. 3. However, when deposed, Inman expressly denied the truth of the statements. Inman disavowed personal knowledge of Officer Gaff giving female inmates favors in exchange for viewing their breasts. Dkt. No. 50, 9:11-25. She stated that Davis had told her Officer Gaff did such things when they were in "lockdown," but that had never happened to her. Dkt. No. 50, 9:16-19. When asked about the statement in her affidavit that "Detention officials and the women inmates knew Officer Gaff would do favors for women inmates if they showed him their breasts," Inman stated she had no knowledge of that and that was "nothing

AO 72A
(Rev. 8/82)

[she] wrote or nothing that [she] said." Dkt. No. 50, 13:22-24.
She did testify that Davis told her that Officer Gaff would do
favors for inmates who showed him their breasts. Dkt. No. 50,
9:16-20.

Inman admitted her signature appeared on the affidavit, but
stated that she "really didn't even read [the affidavit]" prior
to signing. Dkt. No. 50, 7:12-14. Inman testified that the
written statement that she gave to the investigator was "totally
different than [the affidavit]." Dkt. No. 50, 7:20-21. When
she signed the affidavit, Inman stated "she just assumed" it
would be the same as her written statement, although "[s]he
shouldn't have." Dkt. No. 50, 8:9-11.

Likewise, Danny Moore, Davis's boyfriend and housemate,
expressly denied most of the statements contained in his
affidavit. Moore stated that he did read the affidavit prior to
signing it but "[n]ot very well." Dkt. No. 48, 7:6-7.

The affidavit stated that Davis had told Moore that
"Officer Gaff was a sexual pervert" who was sexually abusing
Davis and "everyone knew it." Dkt. No. 39, Ex. 5, ¶ 5. When
asked about that statement, Moore testified that sentence was
"inaccurate" and that he could not "remember that conversation."
Dkt. No. 48, 9:13-14. The affidavit contained a statement that,
around the time Davis was taken to the dentist, Moore spoke to
Davis who supposedly sounded "really stressed and stated that

7

she was going to try to escape because of the sexual perversion and abuse of Officer Gaff" and that Davis "sounded as if she was someone on their [sic] deathbed." Dkt. No. 39, Ex. 5, ¶ 6. When asked about that paragraph, Moore testified "I really don't believe I have ever wrote that. That is not accurate." Dkt. No. 48, 10:17-23. Moore testified that Davis conveyed to him that she wanted to escape, although Davis never stated a specific reason. Dkt. No. 48, 11:1-9.

No deposition of Laster, the other inmate who signed an affidavit, has been submitted. In light of the fact that Moore and Inman expressly denied most of the key statements from their affidavits, the Court is skeptical of whether the statements contained in Laster's affidavit accurately reflect Laster's knowledge. However, the Court's role at this stage is not to weigh the evidence or speculate about credibility. Accordingly, the Court will view the evidence in the light most favorable to Plaintiff and assume the statements in Laster's affidavit are true and accurate.

Laster's affidavit states "[O]fficer Gaff would give women smoking privileges or other favors if the female inmates showed him their breasts or other body parts." Dkt. Nos. 39, Ex. 4. Further, Laster describes an incident that occurred "shortly after" Davis's death, where Officer Gaff transported Laster and another inmate, Kimber Griffin, "to a secluded place near some

rail road tracks and made [the women] show him [their] breasts."
Dkt. No. 39, Ex. 4, 6.  The affidavit then states that Officer
Gaff fondled Laster's breasts and told the women "that if [they]
told anyone, [they] would be in big trouble."  Dkt. No. 39, Ex.
4, ¶ 6.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary
judgment is appropriate "if the movant shows that there is no
genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law."  The court must view
the evidence and draw all inferences in the light most favorable
to the nonmovant.  Adickes v. S.H. Kress & Co., 398 U.S. 144,
157-59 (1970).  The party seeking summary judgment must first
identify grounds that show the absence of a genuine issue of
material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-24
(1986).  To discharge this burden, the movant must show the
court that there is an absence of evidence to support the
nonmoving party's case.  Id. at 325.  The burden then shifts to
the nonmovant to go beyond the pleadings and present affirmative
evidence to show that a genuine issue of fact does exist.
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

A party is not required to "produce evidence in a form that
would be admissible at trial in order to avoid summary
judgment," but "[a] party may object that the material cited to

AO 72A
(Rev. 8/82)

support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. Pro. 56(c)(2); Celotex, 477 U.S. at 324. A non-moving party cannot defeat summary judgment based on evidence that could not be reduced to an admissible form at trial. Pritchard v. So. Co. Srvs., 92 F.3d 1130, 1135 (11th Cir. 1996). Evidence that could not be admitted at trial in any form should not be considered in ruling on a motion for summary judgment. Hodge v. Sec'y, Fla. Dep't of Corr., 464 F. App'x 810, 812 (11th Cir. 2012).

**DISCUSSION**

## I. Claims Against Officer Gaff

### A. Federal Claims

Although the circumstances surrounding the escape of Davis and the discovery of her body would cause some to speculate that she was murdered, there is no evidence that Officer Gaff killed Davis. As discussed below, inappropriate quid pro quo offers are the only allegation regarding sexual misconduct between Davis and Officer Gaff that Plaintiff has substantiated with admissible evidence. The Court concludes that summary judgment in favor of Officer Gaff on the § 1983 claims is appropriate in light of the evidence.

Under certain circumstances, sexual misconduct on the part of a prison or jail official can violate the Constitution. See Boxer X v. Harris, 437 F.3d 1107, 1111 (11th Cir. 2006) ("[W]e

join other circuits recognizing that severe or repetitive sexual abuse of a prisoner by a prison official can violate the Eighth Amendment."); Reid v. Secretary, Fl. Dep't of Corr., 486 F. App'x 848, 852 (11th Cir. 2012); Jones v. Wellham, 104 F.3d 620, 628 (4th Cir. 1997). A pretrial detainee claiming that a jail official violated her Fourteenth Amendment rights must satisfy two requirements.[1] First, the plaintiff must show that the defendant's conduct is objectively serious or caused an objectively serious injury to plaintiff. Farmer v. Brennan, 511 U.S. 825, 834 (1994). Second, the plaintiff must show that the jail official acted with a sufficiently culpable state of mind, or with deliberate indifference to or reckless disregard for the plaintiff's constitutional rights, health, or safety. Id. at 834.

*1. Retracted Statements from Inman and Moore's Affidavits*

As noted above, both Inman and Moore have given textbook examples of "sham affidavits." They have disavowed explicitly

---

[1] The source of Davis's constitutional rights is the Fourteenth Amendment, rather than the Eighth Amendment because Davis was not a convicted prisoner. McDowell v. Brown, 392 F.3d 1283, 1289 n.8 (11th Cir. 2004); see Dkt. No. 39, Ex. 1. Rather, she was incarcerated in jail awaiting trial. The Fourteenth Amendment is the applicable source of rights for pretrial detainees. McDowell, 392 F.3d at 1289 n.8. The distinction between the Eighth and Fourteenth Amendments is largely academic however because, in cases such as this, the same standards govern whether the source of rights is the Eighth or the Fourteenth Amendment. Hamm v. Dekalb Cnty., 774 F.2d 1567, 1574 (11th Cir. 1985).

AO 72A
(Rev. 8/82)

and under oath major sections of their affidavits which were submitted to defeat summary judgment. Those affidavits contained multiple references to sexual interactions between Officer Gaff and Davis; however, almost all of those statements have been retracted. See Dkt. No. 39, Ex. 3, ¶ 7; Dkt. No. 39, Ex. 5, ¶¶ 5, 6, 7, 9. Inman testified that she had no personal knowledge as to (1) whether Officer Gaff would give women smoking privileges for showing their breasts, (2) whether, the day before Davis disappeared, Officer Gaff pulled the transport vehicle over to a secluded place to allow Davis to smoke after exposing her breasts, and (3) whether detention officials knew Officer Gaff would grant inappropriate favors and failed to reprimand him. Dkt. No. 50, 9:11-25. 10:1-25, 13:16-25. Inman testified that she had only heard Davis state that Officer Gaff did such things. Dkt. No. 50, 9:11-25. 10:1-25.

Moore denied ever making the following statements: (1) that "[Davis] told [him] that Officer Gaff was a sexual pervert, was abusing her sexually, and everybody knew it," (2) that in a conversation prior to her escape, Davis "was really stressed and stated she was going to escape[2] because of the sexual perversion and abuse of Officer Gaff," and that she sounded "as if she was someone on their [sic] death bed," and (3) that during his last

---

[2] Moore testified that Davis did tell him she was planning on escaping. However, she did not mention Officer Gaff as the reason. Dkt. No. 48, 10:4-7.

AO 72A
(Rev. 8/82)

conversation with Davis, it was clear that Davis "would do anything to get away from [Officer Gaff's] sexual manipulation of her." Dkt. No. 48, 9:8-14, 10:1-23, 15:7-22.

*2. Hearsay Issues Concerning Inman and Moore's Remaining Statements*

Little remains unretracted. Moore and Inman did testify that Davis made statements to them concerning sexual contact between her and Officer Gaff. Specifically, Moore testified that, when he spoke with Davis the day of her escape, she told him "the perverted old bastard just wanted some pu**y." Dkt. No. 48, 12:4-6. Inman testified that Davis had told her that Officer Gaff gave her smoking privileges for flashing her breasts. Dkt. No. 50, 9:11-19, 11:4-7. However, those out-of-court statements admitted for the truth of the matters asserted present hearsay issues.

"The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment." Jones v. UPS Ground Freight, 683 F.3d 1283, 1293 (11th Cir. 2012) (quoting Macuba v. Deboer, 193 F.3d 1316, 1322 (11th Cir. 1999)). "Nevertheless, 'a district court may consider a hearsay statement if the statement could be reduced to admissible evidence at trial or reduced to admissible form." Id. (quoting Macuba, 193 F.3d at 1323).

At the Motions Hearing, prior to Moore and Inman's retraction of most of the statements in the affidavits, Plaintiff suggested the statement that Davis made to Moore regarding Officer Gaff's motives for taking her to the house could be admissible as a dying declaration.

A dying declaration, also known as a "statement under the belief of imminent death," is an exception to the hearsay rules. See Fed. R. Evid. 804(b)(2). To qualify, a statement must be (1) made by the declarant while believing the declarant's death to be imminent, and (2) made about the cause or circumstances of death. Fed. R. Evid. 804(b)(2). Davis's statement to Moore cannot satisfy these requirements.

For death to be imminent, "the declarant must have spoken without hope of recovery and in the shadow of impending death." Shepard v. United States, 290 U.S. 96, 99 (1933). General fears for one's life are not sufficient. Id. "[A]dmission of utterances of a dying person should be received with great caution." United States v. Mobley, 421 F.2d 345, 357 (5th Cir. 1970). "There must be a settled hopeless expectation that death is near at hand, and what is said must have been spoken in the hush of its impending presence." Shepard, 290 U.S. at 99.

Although Moore testified that when he spoke to Davis "she was very scared" and "was crying," more is required for a statement to be made "in the shadow of imminent death." Dkt.

AO 72A
(Rev. 8/82)

No. 48, 18:22-25.  Even apart from the imminence requirement, the statement could not qualify as a dying declaration because it does not concern the manner in which Davis died.  Rather it describes the nature of Davis's interaction with Officer Gaff. Accordingly, Davis's statement to Moore cannot be reduced to admissible form, and therefore should not be considered in deciding the summary judgment motion.

As for Davis's statement to Inman that Officer Gaff would grant her favors in exchange for exposing herself, Plaintiff has not advanced any argument regarding that statement's admissibility.  It is not apparent to the Court how that statement could be admissible.  Thus, the Court will not consider that statement in evaluating the pending motion.

3. *Laster's Unretracted Affidavit*

What remains is Laster's unretracted statements in her affidavit that (1) Officer Gaff would give women smoking privileges or other favors for exposing themselves and (2) Laster's description of a instance that occurred while she and another inmate, Kimber Griffin, were being transported by Officer Gaff.  Laster does not mention Davis in particular in her affidavit.  As discussed below, the facts in Laster's affidavit are not hearsay but, nevertheless, do not defeat summary judgment.

AO 72A
(Rev. 8/82)

Laster described in her affidavit a disturbing event involving Laster, Griffin, and Officer Gaff. See Dkt. No. 39, Ex. 4, ¶ 6. Laster stated that, shortly after Davis's death, Officer Gaff took Laster and Griffin to a secluded place and forced them to expose their breasts, fondled Laster's breasts, and threatened the women if they told anyone. See Dkt. No. 39, Ex. 4, ¶ 6. This statement, unlike anything Moore or Inman mentioned, concerns forced sexual touching by Officer Gaff, rather than inappropriate offers in exchange for favors. The incident Laster describes lacks any kind of consent.

Unfortunately for Plaintiff, the rules of evidence would bar the admission of Laster's testimony to prove that, on the day of Davis's escape, Officer Gaff acted in a similar manner. Generally, "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Fed. R. Evid. 404(a)(1). For example, in a car accident case, a plaintiff could not admit evidence that the defendant ran a stop sign a week before the accident to show that the defendant ran the stop sign the day of the accident.

Although not urged by Plaintiff, at first blush it might appear that Federal Rule of Evidence 415 would permit admission of this statement. It will not. Under Federal Rule of Evidence 415, "in a civil case involving a claim for relief based on a

16

party's alleged sexual assault or child molestation, the court

may admit evidence that the party committed any other sexual

assaults or child molestation." Fed. R. Evid. 415(a). "Sexual

assault," for purposes of Rule 415, is defined as:

> a crime under federal law or state law . . .
> involving:
> (1) any conduct prohibited by 18 U.S.C. chapter 109A;
> (2) contact, without consent, between any part of the
> defendant's body—or an object—and another person's
> genitals or anus;
> (3) contact, without consent, between the defendant's
> genitals or anus and any part of another person's
> body;
> (4) deriving sexual pleasure or gratification from
> inflicting death, bodily injury, or physical pain on
> another person; or
> (5) an attempt or conspiracy to engage in conduct
> described in subparagraphs (1)-(4).

Fed. R. Evid. 413(d). Federal Rule 415 would not allow evidence

of the forced fondling of Laster's breasts at trial to prove

that Officer Gaff acted in the same way with Davis because the

incident Laster describes does not satisfy any of the five

categories of conduct listed in 413(d). Specifically, 413(d)(2)

is not satisfied because Officer Gaff touched Laster's breasts,

which are not considered genitals pursuant to 413(d). See

Seeley v. Chase, 443 F.3d 1290, 1297 (10th Cir. 2006) (finding

that an incident where police officer rubbed woman's breasts did

not qualify under 413(d)(2)).

In sum, the only evidence of sexual misconduct by Officer

Gaff capable of being admitted at trial is Laster's statement

17

that "Officer Gaff would give women smoking privileges or other favors if the female inmates showed him their breasts or other body parts." Dkt. No. 39, Ex. 4, ¶ 6. That statement is not specific to Davis. Even if a jury could infer that Officer Gaff entered into such an arrangement with Davis the day of her escape, no constitutional violation could be found.

While deplorable, Officer Gaff's inappropriate quid pro quo offers did not violate Davis's constitutional rights. The take-it-or-leave-it nature of the offer meant that Davis did not incur an objectively serious injury. See Washington v. Harris, 186 F. App'x 865 (11th Cir. 2005) (finding no Eighth Amendment violation where prison employee would briefly grab inmate's genitals, kiss inmate, and threaten to perform oral sex on the inmate); Coleman v. Kicklighter, No. CV 207-037, 2008 WL 1817824 (S.D. Ga. 2008) (briefly touching inmate's genitals through pants did not violate Eighth Amendment). In considering similar conduct, the Northern District of Georgia held that a male jail guard was not liable under the Eighth Amendment for allegedly offering an inmate cigarettes if she would expose her breasts. Hammond v. Gordon Cnty., 316 F. Supp. 2d 1262, 1282 (N.D. Ga. 2002).

To the extent that Plaintiff's brief in opposition to summary judgment suggests that Plaintiff can recover for violations of jail policy, that assertion is incorrect. Section

18

1983 only provides a remedy for violations of federal statutes or the federal Constitution, not of internal policies. A violation of a jail's rules, regulations, and/or policies, without more, does not give rise to a federal constitutional violation. Robinson v. Conner, 2:12-CV-397-TMH, 2012 WL 2358955 (M.D. Ala. 2012) (citing Hernandez v. Estelle, 788 F.2d 1154, 1158 (5th Cir. 1986)); see also Doe v. School Bd. of Broward Cnty., Fla., 604 F.3d 1248, 1265 (11th Cir. 2010) ("[A] § 1983 plaintiff must allege a specific federal right violated by the defendant.").

In sum, the scant potentially admissible evidence that Plaintiff has presented to support her claim would not permit a reasonable jury to find Officer Gaff violated Davis's Fourteenth Amendment rights. Granting privileges or favors for exposing body parts does not constitute an objectively serious injury.

B. State Law Claims

Plaintiff has asserted numerous state law claims against Officer Gaff, such as assault, battery, sexual misconduct, sexual battery, custodial sexual misconduct, false imprisonment, and kidnapping. Plaintiff has not come forward with evidence that could be admissible at trial that Officer Gaff touched Davis against her will, transported her against her will, or confined her illegally. Accordingly, summary judgment is appropriate on those tort claims.

19

Plaintiff also asserted a state law wrongful death claim. Defendants contend that Plaintiff's state law claims against Officer Gaff in his individual capacity are barred by Georgia's doctrine of official immunity and that there is no evidence to support the wrongful death claim.  See Dkt. Nos. 28, 43.

Under Georgia law, official immunity "offers public officers and employees limited protection from suit in their personal capacity."  Grammens v. Dollar, 697 S.E.2d 775, 777 (Ga. 2010) (citing Cameron v. Lang, 549 S.E.2d 341 (Ga. 2001)). "[L]aw enforcement officers may be personally liable for negligent actions taken in the performance of ministerial functions, but are immune from personal liability for discretionary acts taken within the scope of their official authority and performed without willfulness, malice, or corruption."  Gish v. Thomas, 691 S.E.2d 900, 904 (Ga. Ct. App. 2010).  Thus, officers receive more protection for discretionary acts than ministerial ones.

Plaintiff argues that Officer Gaff disregarded a number of transportation policies while transporting Davis and that those acts were ministerial.  However, without any evidence that the breach of those duties, even if ministerial, caused Davis's death, Plaintiff cannot recover for wrongful death.

In Gish v. Thomas, the decedent committed suicide in a patrol car by accessing the transportation officer's gun and

shooting himself.  Id. at 902-03.  The Gish court noted that it was "undisputed that at the time of [the decedent's suicide], the Pike County Sherriff's Office did not have written departmental policies or procedures governing handcuffing inmates during transport or the securing of weapons in patrol cars."  Id. at 905.  Based on the absence of policies, the Court of Appeals of Georgia held that the act of transporting a prisoner is discretionary when an officer has wide discretion in handling the job and much of the specifics of prisoner transport are left in the officer's hands.  Id. at 905.

Here, Plaintiff has identified several correction center policies that use mandatory language and seem to impose nondiscretionary duties on the transporting officer.  For example, the department manual states that "[i]n all cases where an inmate is being transported to or from the Coffee County Jail, physical restraints *will* be used to include handcuffing, waist/belly chains and leg shackles.  Dkt. No. 39, Ex. A (emphasis added).  The manual also provides that "*[u]nder no circumstances* will physical restraints be removed during transportation without the express approval of CCJ command level staff."  Dkt. No. 39, Ex. A (emphasis added).

The manual further states that "*[w]henever* female inmates are to be transported by male transport officers, distance and travel times *is* [sic] *to be estimated and compared* to the in-car

21

camera and recording system to insure complete and unbroken recording." Dkt. No. 39, Ex. A (emphasis added). The manual further provides that "[i]f no in-car camera and recording system is available, [and] the transport will be longer than the camera/recorder recording times, *the transport officer will insure that a second officer* is assigned to accompany the transport and witness all interaction and supervision." Dkt. No. 39, Ex. A (emphasis added).

Plaintiff argues the disregard of those ministerial duties created a situation where Davis could easily escape custody and that Davis would still be alive had she not escaped. However, more than mere "but-for" causation is necessary to strip Officer Gaff of official immunity and hold him liable on a wrongful death claim. See Ga. Const. Art. I, § 2, ¶ IX; Cowart v. Widener, 697 S.E.2d 779, 784-85 (Ga. 2010); McAuley v. Wills, 303 S.E.2d 358, 260-61 (Ga. 1983). Absent any indication as to the cause of Davis's death, it is impossible to determine whether Officer's Gaff's violations of policy proximately caused her death.

## II. Claims Against Sheriff Pope

Pursuant to the Motion to Dismiss Order, all claims against Sheriff Pope in his official capacity were dismissed. See Dkt. No. 20. The Fourteenth Amendment claim against Sheriff Pope in his individual capacity, however, remains pending. See Dkt.

AO 72A
(Rev. 8/82)

Nos. 20, 29 Ex. 2.  Plaintiff's state-law claim for inadequate training, hiring, and supervision also remains pending.  Dkt. No. 29, Ex. 2.

## A. Section 1983 Claims

Plaintiff attempts to hold Sheriff Pope liable on the basis of his position as a supervisor.  However, without an underlying constitutional violation, Sheriff Pope cannot be held liable.  See Penley v. Eslinger, 605 F.3d 843, 854-55 (11th Cir. 2010) ("Absent a deprivation of federal rights, [a supervisory sheriff] cannot be liable in his official capacity under § 1983.")

## B. State-Law Claim

The state law claims against Sheriff Pope in his individual capacity should also be dismissed.  As discussed above, Georgia affords public officials immunity from liability for "discretionary actions taken within the scope of their official authority, and done without willfulness, malice, or corruption."  Grammens, 697 S.E.2d at 777 (citation omitted).  Sheriff Pope's actions at issue involve discretionary functions.  See Harvey v. Nichols, 581 S.E.2d 272, 276-77 (Ga. Ct. App. 2003) (operation of jail, supervision of jail employees, and establishment of policies and procedures at jail are discretionary functions).  For his discretionary acts, Sheriff Pope is shielded from liability unless he harbored a "deliberate intention to do

wrong." <u>Merrow v. Hawkins</u>, 467 S.E.2d 336, 337 (Ga. 1996).
Plaintiff has produced no evidence to suggest that Sheriff Pope
harbored a deliberate intention to do wrong. Accordingly,
Sheriff Pope cannot be liable for state law claims in his
individual capacity.

**CONCLUSION**

Based on the foregoing, Officer Gaff's Motion for Summary
Judgment, Dkt. No. 28, is **GRANTED**. Sheriff Pope's Motion for
Summary Judgment, Dkt. No. 29, is also **GRANTED**. The Clerk of
Court is directed to close the case and enter the appropriate
judgment.

**SO ORDERED**, this 30th day of July, 2013.

LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)